(8 App. Div. 230.)

SUN PRINTING & PUBLISHING ASS'N et al. v. MAYOR, ETC., OF CITY OF NEW YORK et al.

(Supreme Court, Appellate Division, First Department. July 28, 1896.)

1. MUNICIPAL CORPORATIONS—PUBLIC WORKS—CITY PURPOSES.
    The public purposes for which cities may incur liabilities are not restricted to those for which precedents can be found, but the test is whether the work is required for the general good of all the inhabitants of the city.

2. EVIDENCE—JUDICIAL NOTICE—HISTORY OF CITY.
    In a proceeding to determine the constitutionality of a statute authorizing a city to construct at its own expense a street-railroad system (Laws 1891, c. 4), the court will take judicial notice of the fact that efforts to construct such railroad system by private enterprise had failed for want of capital, and that the needs of the city were constantly increasing.

3. CONSTITUTIONAL LAW—PRESUMPTION IN DOUBTFUL CASES.
    Where a doubt exists as to whether an enterprise which a city is authorized by statute to undertake is for a city purpose, it will be decided in the affirmative, as, in all questions involving the constitutionality of a statute, every intendment is in its favor.

4. LOCAL OFFICERS—RAPID TRANSIT COMMISSIONERS.
The board of rapid transit commissioners created by Laws 1891, c. 4, as amended by subsequent statutes, for each city containing over 1,000,-000 inhabitants, with authority to determine whether a rapid transit railway, in addition to the existing street railways in their cities, is necessary, and to locate the routes, are local officers, though appointed by the legislature. Ingraham and Rumsey, JJ., dissenting.

5. CONSTITUTIONAL LAW—RAPID TRANSIT ACT.
The construction of a rapid transit railway in New York City at the expense of the city, so as to afford needed facilities to the inhabitants of the city in traveling between their homes and places of business, is a city purpose, and therefore the rapid transit act (Laws 1891, c. 4, as amended by subsequent statutes), authorizing the construction of such railway in each city of over 1,000,000 inhabitants, is constitutional. Ingraham and Rumsey, JJ., dissenting.

6. MUNICIPAL CORPORATIONS—GIVING AWAY PROPERTY—LENDING CREDIT—CONSTITUTIONAL LAW.
The rapid transit act (Laws 1891, c. 4, as amended by Laws 1892, cc. 102, 556; Laws 1894, cc. 528, 752; Laws 1895, c. 519) § 34, authorizes the rapid transit commissioners to enter into a contract for the construction of a railway on a route adopted by them, the cost to be paid out of the city treasury. The statute also provides that the contract shall require the contractor to equip and operate the road, at its own expense, for a certain term of years, and that he shall annually pay to the city, as rental, a sum not less than the annual interest on the bonds to be issued for the construction of the road. Held, that such provision does not violate Const. art. 8, § 10, which provides that no city shall give any money, or lend its money or credit, in the aid of any individual, association, or corporation. Ingraham and Rumsey, JJ., dissenting.

7. CONSTITUTIONAL LAW—INQUIRING INTO LEGISLATIVE INTENT.
Where the apparent meaning of a statute is plain, and relates to matters within the power of the legislature, the courts will not inquire whether such language was meant to conceal a design to violate the constitution.

8. SAME—LOCAL ACTS.
The rapid transit act (Laws 1891, c. 4), which provides for the appointment of a board of rapid transit commissioners "in each city having over 1,000,000 of inhabitants," is not a local statute.

Appeal from special term, New York county.

Action by the Sun Printing & Publishing Association and others against the mayor, aldermen, and commonalty of the city of New York and others. From a judgment entered on a decision dismissing the complaint, plaintiffs appeal. Affirmed.

The plaintiffs are taxpayers in the city of New York. They bring this action under the provisions of chapter 531 of the Laws of 1881, and the amendatory acts (chapter 673, Laws 1887; chapter 30, Laws 1895), in order to prevent what it is claimed will be a waste of public funds. It is not necessary to specify in detail the acts sought to be enjoined. They all arise in the carrying out of the rapid transit legislation (chapter 4, Laws 1891; chapters 102, 556, Laws 1892; chapters 528, 752, Laws 1894; chapter 519, Laws 1895); and the only question presented is whether that legislation is constitutional. The court at special term held that it was, and accordingly dismissed the complaint. The general scheme of the act of 1891, as subsequently added to and amended, is as follows: Section 1 creates a board of rapid transit railroad commissioners in each city of the state having over 1,000,000 of inhabitants, according to the last preceding national or state census, and prescribes how it shall be composed. Section 4 directs the different boards to consider the question whether a rapid transit railway or railways, in addition to any already in existence, are necessary to the interests of the cities

in which these boards are appointed, and, if they shall decide that such necessity exists, to determine and .establish the routes thereof, and the general plan of construction. Authority is given to locate the routes "over, under, upon, through, and across any streets, avenues, and lands within such city," upon obtaining the consent of the local authorities having control of the streets to be used, and of the owners of one-half in value of the property bounded upon the same. Section 5 directs the board to transmit the routes and plan to the local authorities, and, if they shall approve the same, to proceed to obtain, if possible, the consent of the property owners. If the latter cannot be obtained, the board is authorized to apply to the general term of the supreme court in the judicial district in which the road is to be constructed, for the appointment of three commissioners to determine and report, after due hearing, whether such railway ought to be constructed and operated. The general term is required to appoint such commissioners; and if the latter report in favor of the construction and operation of the road, and their report be confirmed by the court, such report, when so confirmed, is to be taken in lieu of the consent of the property owners. Section 34 is a new section, added to the act of 1891 by section 9 of chapter 752 of the Laws of 1894; and this is the first of a series of sections providing for a new method of obtaining rapid transit instituted by the latter act. It directs that the board,.in case of the approval by popular vote as thereafter prescribed, shall contract with some person, firm, or corporation for the building of the road at the expense of the city, and that the contract shall contain a clause that the contractor shall operate the road, when completed, at his own expense. for a period of not less than 35 nor more than 50 years. There are other important provisions respecting the contract, which will be referred to hereafter. Section 37 provides for an issue of city bonds to meet the expense of construction. Section 39 bestows upon the board the right to acquire whatever property may be necessary in building the road, and subsequent sections set forth the method of condemnation. In addition to the foregoing provisions, chapter 752 of the Laws of 1894 contains four sections (11–14), which do not, in terms, amend any of the prior acts. Section 12 directs that the question of construction shall be submitted to the qualified electors of the city at the next ensuing general election. Section 13 provides that, in case there shall be a majority vote in favor of construction, the board shall at once proceed with the work. Section 14 postpones all action until the question shall have been submitted to the people, and a favorable result obtained.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, WILLIAMS, and INGRAHAM, JJ.

Franklin Bartlett, for appellants.
Albert B. Boardman and Edward M. Shepard, for respondents.

BARRETT, J.   The legislation in question is assailed upon many grounds. The first, and perhaps the most important, is that it violates the constitutional provision that no county, city, town, or village shall "be allowed to incur any indebtedness, except for county, city, town, or village purposes." Const. art. 8, § 10. The question is thus raised whether a rapid transit railroad, wholly within the limits of a city, is a city purpose. That it is a public purpose does not seem to admit of question. But is it a legitimate city purpose? In considering this question in connection with an act for the laying out of public places and parks in the Twenty-Third and Twenty-Fourth wards of the city of New York, and in the adjacent district of Westchester county, the court of appeals (Judge Finch speaking for the court) said that "the purpose must be primarily the benefit, use, or convenience of the city, as distinguished from that of the public outside of it, although they may be inci-

dentally benefited, and the work be of such a character as to show plainly a predominance of that purpose; and then the thing to be done must be within the ordinary range of municipal action." In re Mayor, etc., of New York, 99 N. Y. 569, at page 590, 2 N. E. 652. The learned counsel for the defendants claim that a city use is simply a public use for the special benefit of a city. The plaintiffs, upon the other hand, claim, that the further condition indicated by Judge Finch exists, namely, that the "thing to be done must be within the ordinary range of municipal action"; and they insist that a railroad is not within that range. No test is furnished in the case cited for determining the precise scope of municipal action, and none has been suggested to us which is in any way satisfactory. In considering this question, it must be premised that cities are not limited to providing for the strict necessities of their citizens. Under legislative authority, they may minister to their comfort, health, pleasure, or education. They are not limited to policing the city, to paving its streets, to providing it with light, water, sewers, docks, and markets. They may also be required by the sovereign power to furnish their citizens with schools, hospitals, dispensaries, parks, libraries, and museums, with zoölogical, botanical, and other gardens. They may even gratify our ears with music of a summer afternoon, or minister to our comfort by providing us with public baths. Expenditures in all these directions have never been questioned. Where, then, shall we draw the line? It would be very simple to draw it at those purposes for which precedent in the past can be found, and to exclude all others. This test should be easy of application, but would be essentially vicious and erroneous. Growth and extension are as necessary in the domain of municipal action as in the domain of law. New conditions constantly arise, which confront the legislature with new problems. As the structure of society grows more complex, needs spring up which never existed before. These needs may be so general in their nature as to affect the whole country or the whole state, or they may be local, and confined to a single county or municipality. In any case, it is the duty of that legislative body which has the power and jurisdiction to apply the remedy. To hold that the legislature of this state, acting as the parens patriæ, may employ for the relief or welfare of the inhabitants of the cities of the state only those methods and agencies which have proved adequate in the past, would be a narrow and dangerous interpretation to put upon the fundamental law. No such interpretation has thus far been placed upon the organic law by the courts of this state. Whenever the question has been considered, it has been universally treated in the broadest spirit. In the case already cited (In re Mayor, etc., of New York), it was contended that the acquisition of parks outside of the boundaries of the city was not within the range of a city purpose; but the court held that it was within that range, for the reason that the lands were "so near, so convenient of access, so likely to be overtaken and surrounded by the city's growth, so desirable for the health and recreation of the citizens, and so cheaply to be got in comparison with the consequences of

delay, as to indicate a primary and predominant city purpose in a matter itself within the ordinary range of municipal action." In that case, the court referred to the previous purchase, 40 miles away from the city, of water rights and lands for dams and reservoirs to supply the citizens with water. That purchase had never been questioned. "It is true," said Judge Finch, "that the purpose contemplated was to bring the pure water to the citizens, while here it contemplates leading the citizens to the pure air. Granted that the necessities are not equal, and the modes of supply differ, and yet that test of a city purpose which asks if the property bought and the money spent go outside of the corporate boundaries must be abandoned." In Hequembourg v. City of Dunkirk, 49 Hun, 553, 2 N. Y. Supp. 447, the board of water commissioners of the city of Dunkirk was authorized to supply, not only the city, but its inhabitants, with electric light. It was held to be a city purpose, within the provision of the constitution. The rule was laid down that the municipality was not limited to its mere duty to supply the city with light, but that it might, "in its discretion, in connection with lighting the streets," also supply citizens with light in their private dwellings. "Numerous cases," said Judge Haight, "have arisen in which large and extensive waterworks had been established for the purpose of supplying cities and villages with pure and wholesome water. In such cases, water has been furnished to private consumers at fixed rates, and the power to do this has been sanctioned by the courts as one properly exercised by the municipal government, pure and wholesome water being recognized as necessary to preserve the public health. And in various cities gas works have been established, in which light has been supplied by the municipality to private residences, at a fixed charge, as well as used for the lighting of the streets,"—citing 1 Dill. Mun. Corp. § 27; Wheeler v. Philadelphia, 77 Pa. St. 338; Western Sav. Fund Soc. v. City of Philadelphia, 31 Pa. St. 175; Lehigh Water Co.'s Appeal, 102 Pa. St. 515. The case cited from 77 Pa. St. 338, clearly lays down the rule that the municipal corporation is not limited to acts within the line of its duty to its citizens. "While it is no part," said the court, "of the ordinary and necessary duties of a municipal corporation to supply its citizens with gas and water, it is, nevertheless, true that it may lawfully do so." See, also, the broad language and progressive views of Judge Emott with regard to street purposes in People v. Kerr, 27 N. Y. 194, referred to with approval by Judge Danforth in Story v. Railroad Co., 90 N. Y. 160.

Unless, therefore, we are to lay down a hard and fast rule limiting municipal action to what has already been done, and to nothing else, the mere fact that a rapid transit railroad in a city was never before planned or executed by a municipal corporation ought not to foreclose the question. The true test is that which requires that the work should be essentially public, and for the general good of all the inhabitants of the city. It must not be undertaken merely for gain or for private objects. Gain or loss may incidentally follow, but the purpose must be primarily to satisfy the need, or

contribute to the convenience, of the people of the city at large. Within that sphere of action, novelty should impose no veto. Should some inventive genius by and by create a system for supplying us with pure air, will the representatives of the people be powerless to utilize it in the great cities of the state, however extreme the want and dangerous the delay? Will it then be said that pure air is not as important as pure water and clear light? We apprehend not. The illustration may seem fanciful to-day, but who shall say that peculiarly local conditions may not arise which will make it a vital question hereafter?

The health of the people is dependent in a measure upon decent and convenient transit between their homes and their places of business; not in as great a degree as upon light, air, and water, but in no inconsiderable degree. The scheme under consideration is intended to supply not only rapid, but such decent and convenient, transit, to ameliorate the present congestion which at certain hours of each day is fraught with danger to thousands; and to furnish business men and women with the means of reaching their homes at such hours without being crushed in body or worn in nerve. The question cannot be justly solved without considering the problem which was before the legislature when it was asked to pass these acts. The court must take judicial notice of the city's history in this regard. We know that relief had been sought through the instrumentality of private adventure, and that capital was not forthcoming. The legislature had before it this latter crucial circumstance. The need of the people was growing day by day. The hope of relief in the ordinary manner was steadily receding. Shall it be said that, in such emergency, the people were helpless except through an amendment to the constitution; that in such a crisis, and under such exceptional circumstances, the legislature could not adjudge, upon all the facts before it, a new and imminent, though hitherto unknown, city purpose? It is not the province of the court to deny the legislative power to thus adjudge. The present enterprise was demanded of the city by the surrounding conditions. It was a public enterprise. It was not for travelers nor for public travel, in the ordinary sense. It was for daily and hourly use in the business and home life of our people. It was entirely within the boundaries of the city. It was primarily for the benefit alone of its long-suffering inhabitants. It was not tainted with even the suggestion of a private character, nor with the purpose of gain. The sole object was public and general locomotion in the locality; locomotion for which there was a crying need; safe, rapid, healthful locomotion; locomotion worthy, in fine, of a civilized metropolis and of a well-governed municipality.

The case at this point is clearly within the principle of People v. Kelly, 76 N. Y. 475. It was there held that moneys used in acquiring the New York and Brooklyn Bridge property would be expended for a city purpose. No apparently valid distinction exists between transportation over a bridge from one county into another and transportation within the city limits by a rapid transit railway. If one comes within the "ordinary range of municipal action," so, surely,

does the other.    Not only that, but one of the chief uses of the
bridge was and is for railway purposes.    Section 7 of chapter 300
of the Laws of 1875 provides as follows: "The said trustees may
operate and authorize to be operated a railroad or railroads over
said bridge, and fix the fare to be paid by any passenger on any rail-
road operated by them."    It would be a strange result if a city might
build a railway over a bridge to another city, and might not build a
railway in its own streets, and wholly within its own limits.    It is
plain that this bridge case repudiates any distinction between
bridges and railways, due to city ownership of the former in the
past.    If it had been intended to sanction such a distinction, cer-
tainly the fact would have been pointed out that there had been such
ownership of bridges; and the objectionable railway feature would
have been adverted to, and held to be merged in, and subordinated
to, the lawful bridge project.    But the opinion is quite silent on
these points.    There are, however, many expressions in the opinion
which favor our present view.    "It is impossible," said Judge Earl,
"to define in a general way, with entire accuracy, what a city purpose
is, within the meaning of the constitution.    Each case must largely
depend upon its own facts, and the meaning of these words must be
evolved by a process of exclusion and inclusion in judicial construc-
tion.    It would not be a city purpose for the city of New York to
build a railroad from that city to Philadelphia, or to improve the
navigation of the Hudson river generally between that city and
Albany, although incidental benefits might flow to the city."    That
illustration marks the test which was in the learned judge's mind.
Would he have thus spoken of a railroad from one point to another
within the city limits?    Such a railroad, strictly for the needs of the
locality, would rather have come within his other observation:
"Such improvements are for the common and general benefit of all
citizens, and have always been regarded as within the scope of
municipal government."

The past history of the state indicates that the special evils at
which the constitutional provision was aimed were improvident in-
vestments in the securities of railroad corporations of the funds of the
cities, towns, and villages along the route.    Of course, these rail-
roads were not built for the use of any of the municipalities in ques-
tion, and, in general, benefited no one of them more than another.
The investment of their funds in this manner was simply a specula-
tion, which was generally unprofitable.    It is a sound policy to
check municipalities in embarking their capital in business enter-
prises for the mere hope of gain.    It is not proper that a city should
engage in the railroad business, or, indeed, in any other business,
merely as a private adventure.    Its actuating motive in every work
it undertakes should simply be to advance the interests of its citizens
by remedying some existing evil.    That was the sole motive in the
legislation under review.    The rapid transit board is not to consider
whether a railway could be made a paying investment, but whether
(Laws 1894, c. 528, § 4) it would be "in the interest of the public and
of the city in which it [the board] is appointed."    When we recall
the fact already adverted to that the evil in question was one which

private capital was disposed to leave unremedied, the obnoxious element of paternalism, or of competition by a city with its citizens in the business walks of life, entirely disappears; and we find, not as contended, the entering wedge of socialism, but simply novel municipal work, undertaken under the stress of dire necessity. Finally, it should be said that, if any doubt exists as to whether or not this is a city purpose, it must be resolved in favor of the legislative action. In this, as in all questions involving the constitutionality of a statute, every intendment is in favor of validity. The legislature has, in effect, declared the purpose to be a municipal one, and its judgment must govern unless clearly erroneous. People v. Kelly, 76 N. Y. 489; In re Mayor, etc., of New York, 99 N. Y. 591, 2 N. E. 642. The language of Judge Earl in People v. Kelly is again most instructive, and we think conclusive: "The legislature,'" he says, "when legislating in view of this constitutional limitation, must determine, in the first instance, what is a municipal purpose. Its decision is not, however, final. When its act is challenged as in conflict with this constitutional limitation, the courts must determine whether debt is authorized to be incurred for a purpose not municipal. But, as the dividing line between what is a municipal purpose and what is not is in many cases shadowy and uncertain, great weight should be given by the courts to the legislative determination, and its action should not be annulled unless the purpose appears clearly to be one not authorized. As said by Judge Folger in Weismer v. Village of Douglas, 64 N. Y. 91: 'If the purpose designed by the legislature lies so near the border line that it may be doubtful on which side of it it is domiciled, the courts may not set their judgment against that of the lawmakers.'"

These considerations seem to us to be decisive of this particular question. It is proper, however, that we should briefly notice another view of it, which the appellants, in their point with regard to local self-government, impliedly present, namely, that a city purpose presupposes immediate municipal control, and that there can be no city purpose without actual and direct corporate possession, control, and use. This is the first time it has ever, to our knowledge, been suggested that the city purpose referred to in the constitution relates to the method of doing a thing, rather than to the thing itself. We suppose that the real question is whether municipal construction of a rapid transit railway within the city limits, for the benefit, mainly, of the people of the city, is itself—that is, inherently—a city purpose. The machinery provided for effecting this purpose surely throws no light upon the main question. The machinery is not the purpose. Whether the legislature has provided constitutional machinery is another question. It, at least, attempts to create corporate agencies when "in each city" having a certain population it directly appoints a board of rapid transit commissioners "in and for such city." Laws 1894, c. 752, § 1. And it has created these agencies effectually if such direct appointment was constitutional. That would seem to close the discussion as to direct municipal control. It is quite immaterial whether these municipal agents are appointed in one way or in another, so long as they are constitutionally appointed. If con-

stitutionally appointed, they are as much municipal agents as though they were appointed by the mayor. We do not mean municipal agents for the performance of corporate duties; that is, municipal agents for whose misfeasance or nonfeasance there would be a corporate liability. We mean municipal agents to effect the public purpose decreed by the sovereign power.

Whether public officials are local or state officers depends upon the functions which they are required to perform, not upon the source of their appointment. These rapid transit commissioners are clearly local officers in each city embraced within the statute; that is, local officers lawfully appointed by the legislature for each locality. Their character does not depend upon the form or general structure of the act. Local officers may be appointed in a general act, as well as in a local act. The act in question appoints a local board for each city embraced within its classification, varied in its membership by variations as to certain local officials. The functions of these boards are strictly local. Their primary function is to consider and determine whether it is for the interest of the public and of the city in which each is appointed that a rapid transit railway should be established therein. Laws 1894, c. 528, § 4. They act, in fact, for the particular city throughout. They acquire property for it. They sue in its name and on its behalf. They are even spoken of in the act as the "city's board of rapid transit commissioners." Laws 1894, c. 752, § 34. It is provided (section 60) that all property acquired under the provisions of the act "shall be, and shall be deemed to have been, acquired for public uses and purposes, and for the purpose of affording increased facilities for rapid transit between points within the city acquiring such property." If the board shall at any time cease to exist, the act declares that the legislature may provide what public officer or officers of the city shall exercise its power under any existing contract, and, in default of such provision, that such powers and duties shall be deemed to be vested in the mayor of the city.

The language of Judge Earl in the case of Mayor, etc., of New York v. Tenth Nat. Bank, 111 N. Y. 454, 18 N. E. 620, is quite applicable here. Speaking of the commissioners of the New York county courthouse, that learned judge said:

"The commissioners appointed to build it were county commissioners, engaged in disbursing county moneys, and discharging functions devolved upon them as county officials or agents. It matters not that they were appointed by the mayor of the city. It was for the legislature to determine how they should be appointed. It could have named them in some act, or could have devolved their appointment upon the board of supervisors, or the sheriff, or some other local officer. Their character as county commissioners depended, not upon the source of their appointment, but upon the nature of their duties and powers, and of the work they were required to perform."

For the same reason, it was held in People v. Civil Service Supervisory & Examining Boards of City of New York that employés of the aqueduct commissioners were in the civil service of the city. 41 Hun, 287, affirmed, on opinion below, in 103 N. Y. 657.

The same doctrine was reaffirmed, in substance, in People v. An-

drews, 104 N. Y. 574, 12 N. E. 274. It was there held that, while excise commissioners may be in one sense (and that a technical one) state officers, they came within the purview of an act which declared that all appointments to office in the city of New York should be made by the mayor without confirmation. This was put upon the ground that their duties, although affecting the general public, were to be performed within the same limits as those which confine the municipality.

Thus, this rapid transit board was an agency provided for the city by the legislature for a public purpose, especially affecting the locality,—that is, for a city purpose; and it was so provided in the exercise of the legislature's sovereign powers. "Municipal corporations," said Judge Earl in Mayor, etc., of New York v. Tenth Nat. Bank, supra, "are creatures of the state, and exist and act in subordination to its sovereign power." "Municipal corporations," said Judge Andrews in Brown v. Mayor, etc., 63 N. Y. 244, "are agencies of the state, through which the sovereign power acts in matters of local concern." It would seem to be quite clear, therefore, that the direct appointment of these commissioners by the legislature has no possible significance in the solution of the question whether this is a legitimate city purpose, or, rather, whether the legislature has constitutionally adjudged it to be a legitimate city purpose.

Still less is this question embarrassed by the terms of the act with regard to the construction and operation of the road. It is quite immaterial, so far as the question of city purpose is concerned, whether the road shall be built in one way or in another, or operated in one way or in another. The material fact is that the road (section 3) "shall be and remain the absolute property of the city so constructing it, and shall be, and be deemed to be, a part of the public streets and highways of said city, to be used and enjoyed by the public upon the payment of such fares and· tolls, and subject to such reasonable rules and regulations, as may be imposed and provided for the board of rapid transit commissioners in said city." Laws 1894, c. 752, § 9, as amended by Laws 1895, c. 519, § 30. How this latter provision shall be effectuated, whether by a long lease or a short lease, by a lease with this covenant or that covenant, by a lease with or without provision for renewal, by an individual lessee or a corporate lessee, or by no lease at all, but simply by direct municipal service, is mere matter of detail. The legislature could lawfully provide how the road should be constructed and operated, and upon what terms and conditions; and it could lawfully confer authority upon the agents provided for the city to make these terms and conditions. Its directions on that head surely did not make or unmake the essential factor of a city purpose. The appellants' view of this phase of the question necessarily concedes that it would be a city purpose—apart from other objections—if the road, when constructed, were to be operated directly by the city or its immediate agents; that is, by a horde of new officials. The legislature, in its wisdom, (and who will venture to assert that it was not wisdom?) has set its face against this mode of executing the adjudged purpose. It has sought to grant relief,

and yet to keep the road out of the dark domain of local political activity. To accomplish this, it has placed the contractor as a breakwater between the city and an evil far greater than that which it was implored to remedy. Has the adjudged purpose ceased to be a city purpose for that reason? If not (and, surely, no one will say it has), is not the debate simply reduced to a doubt as to whether the commissioners will do their full duty by the city which they lawfully represent? And how can it be justly maintained that the principle of local self-government is infringed, when the people themselves,—the qualified electors of the city,—with full knowledge of what this act contemplates, are afforded an opportunity of deciding the main question of whether there shall be municipal construction through the agency of these very commissioners, and when, in addition to this prerequisite, it is provided that not a step shall be taken in the direction of such construction without the approval by the city's local authorities of the "plans and conclusions" adopted by the board? In no aspect of this question does it seem to us that these enactments can be judicially condemned as a violation of the constitutional provision under consideration.

The next question presented is whether there has been a violation of the other portion of section 10 of article 8 of the constitution, providing that:

"No county, city, town or village shall hereafter give any money or property, or loan its money or credit to or in aid of any individual, association or corporation."

Section 34 of the act, as amended, authorizes the rapid transit board to—

"Enter into a contract with any person, firm or corporation, which in the opinion of said board shall be best qualified to fulfill and carry out said contract, for the construction of such road or roads, upon the routes, and in accordance with the plans and specifications so adopted, for such sum or sums of money, to be raised and paid out of the treasury of said city, as hereinafter provided, and on such terms and conditions, not inconsistent with the aforesaid plans and specifications, as said board shall determine to be best for the public interests. * * * Such contract shall also provide that the person, firm or corporation so contracting to construct said road or roads shall, at his or its own cost and expense, equip, maintain and operate said road or roads for a term of years to be specified in said contract, not less than thirty-five, nor more than fifty, years, and upon such terms and conditions as to the rates of fare and the character of service to be furnished and otherwise as said board shall deem to be best suited to the public interests, and subject to such public supervision and to such conditions, regulations and requirements as may be determined upon by said board. * * * The contract may also provide for a renewal or renewals of the lease upon such terms and conditions as to the board may seem proper, and also for the valuation of the property belonging to the lessee and its purchase by the city in case the lease should not be renewed. Such contract shall further provide that the person, firm or corporation so contracting to construct, maintain and operate said road shall annually pay into the treasury of said city, as rental for the use of said road, a sum which shall not, except as thereinafter provided, be less than the annual interest upon the bonds to be issued by said city for the construction of said road as thereinafter provided for, and in addition to said interest a further sum which shall not be less than one per centum upon the whole amount of said bonds: provided, that in estimating such annual interest and additional percentage there shall be

deducted from the amount of said bonds the amount thereof issued to pay for rights, terms, easements, privileges or property other than lands acquired in fee. Such rental and the term for the operation of said road shall begin as to said road or any section thereof when the same shall be declared by the board of rapid transit railroad commissioners to be completed and ready for operation. For the purpose of estimating one per centum upon the ascertainment of the amount of such rental, there shall be included such portion of the said bonds as shall have been issued to pay interest on bonds theretofore issued under the provisions of the act, except bonds issued to pay for rights, terms, easements, privileges, or property other than lands acquired in fee."

Subsequent portions of the section direct that the contractor shall give a bond to the city in such amount as the board shall fix, conditioned for the prompt payment of the rent and the faithful performance of the other covenants and conditions of the contract; also, for the deposit with the chief financial officer of the city, as further security, of not less than $1,000,000 in money or approved securities, to be returned, with interest or accumulations, upon the completion of the road. The city is also given a first lien upon the rolling stock, and the right to take possession of the road, upon the contractor's failure to pay rent or breach of any of his agreements, and either itself operate the same or relet the contract; the original contractor being entitled to the balance after payment of the rent and all other charges and expenses, and being liable for any deficiency. A right of action is also given to the city, in case of breach of the contract, to forfeit the contractor's rights thereunder, and recover damages.

Section 35 exempts the contractor from taxation in respect to his interest under the contract, and to the rolling-stock and equipment of the road. Section 36 directs advertisement for proposals. Section 37 directs the issuance of bonds to pay for construction, not to exceed $55,000,000, such bonds to be exempt from taxation.

The argument against the plan outlined above would appear to be about as follows: The city is to pay for the building of the road, and is then at once to lease it to the builder for a long period. The right to run the road and receive the income is the only valuable attribute of ownership. The length of the lease is such as practically to confer title in fee. The rent is merely nominal. Consequently, the city builds the road, and substantially presents it to the contractor; and so it "gives" its "property" to the contractor, in violation of the constitution. This is the plaintiffs' first position. There are a number of unjustifiable assumptions here, of which the chief one is that the city can receive no substantial return for its investment. The act does not provide that the contractor shall be entitled to the lease at a rent of the annual interest upon the bonds and the further sum of 1 per centum upon the whole amount thereof. That is the minimum,—a check upon the action of the commissioners. They are at perfect liberty to obtain as much more as may be obtainable. In this particular, as in many others, they are vested with a wide discretion. The plaintiffs' argument rests necessarily upon the theory that the board will not faithfully discharge its duties to the city, but will act entirely in

the interest of the contractor,—an inference which is purely gratuitous. That a city may, in general, lease its property, such as wharves or market stalls, and for a long period, cannot be doubted. We can discern no difference in principle between leasing structures already in existence, and contracting with some one to build such structures, paying him for his work, and then permitting him to have the use of them for an annual rental. It can make no difference whether A. is the builder, and B. the lessee, or whether A. fills both positions. In fact, by concentration upon a single individual or corporation, as contractor first and lessee afterwards, better terms could probably be obtained for the city in both directions. The doubt must arise at that part of the proceedings where the lease is to be made. It is then, if at all, that there is a substantial gift of the city property. But it is quite impossible to spell such a gift out of the legislation in question. There can by no possibility be more than a disadvantageous bargain. That this is not enough was directly decided in Tocci v. City of New York, 73 Hun, 46, 25 N. Y. Supp. 1089. This case upheld the constitutionality of chapter 339 of the Laws of 1892, an act imposing upon the city of New York the payment of one-half the expense of elevating certain railroad tracks in the city. Van Brunt, P. J., said (page 52, 73 Hun, and page 1094, 25 N. Y. Supp.):

"Even if the claim that the city contributes to the private structure of the railroad were true, if, in consideration of such contribution, the railroad surrenders rights which it had to public streets and avenues, and the legislature chose to permit the city to buy out such rights by contributing to the expenses incurred because of such surrender, we see no possible constitutional objection thereto. It is merely paying a consideration for substantial advantages supposed to be gained. And we have nothing to do with the question whether the legislature directed the city to pay a high or a low price for the privileges which it acquired, or make an improvident bargain thereof, if their value is of such a character that an absolute gift cannot be inferred."

We think the plaintiffs' primary proposition on this head is wholly without merit.

Their second position is entitled to more serious consideration. Does the act contemplate a loan of the city's money or credit to or in aid of any individual, association, or corporation? The transaction authorized by the law clearly cannot effect a partnership between the city and the contractor. The relation of lessor and lessee does not create a joint interest. The city remains throughout, in the eye of the law, the absolute owner. That the relation of lessor and lessee, which is in terms established upon the face of the contract, cannot, by judicial inference, be turned into that of partners, was directly decided in Walker v. City of Cincinnati, 21 Ohio St. 14, where similar legislation was upheld as against a similar constitutional prohibition.

In Taylor v. Commissioners, 23 Ohio St. 76, the Walker Case was distinguished, but its doctrine was fully approved. The court said, through White, C. J., speaking of the facts in the Walker Case:

"The proprietary interest in the road when completed is as fully in the municipality as that of any other of its public works. It is the road, 'owned' by the municipality, that is authorized to be leased. The public use for

which the road was built is to be preserved, and the power of leasing the right to use and operate it is designed only as a mode of making such use available to the public."

How, then, can the city be said to lend its money or credit to or in aid of the contractor? Only by our determining that the legislature meant to do so, and did not mean what, upon the face of the act, it said. The argument upon that head is that the legal title of the city will be but technical, and that the beneficial rights attaching to ownership pass to the contractor; that the risk throughout is the city's, the profit the contractor's. Yet here we have a direct contract to build the road for a sum to be agreed upon between the contractor and a carefully selected board; and, further, we have a direct contract to lease the road when built for a sum to be likewise agreed upon between the same parties. Assuming these to be honest contracts, meaning what they profess, the city does not lend its money or credit to the contractor. It surely does not do so when it pays him the contract price of his work. It simply pays its own debt to him. When it issues bonds to raise the money to pay that debt, it does not lend its credit to the contractor. It utilizes its own credit for its own purposes, namely, to enable it to pay its own obligations. Shall we, then, go behind the legislative declaration, and inquire whether its, at least, superficially innocent language was meant to cloak a design to violate the constitution? That would be to treat a legislative enactment as we would the acts of individuals in a suit to set aside those acts as fraudulent. The courts cannot thus probe the legislative conscience, nor can they try its intent and motives as they would questions of alleged fraudulent intent in an ordinary action. Still less can they draw unconstitutional inferences from unambiguous constitutional expressions.

It was said in People v. Draper, 15 N. Y. 545, that:

"The courts cannot impute to the legislature any other than public motives for their acts. If a given act of legislation is not forbidden by express words, or by necessary implication, the judges cannot listen to a suggestion that the professed motives for passing it are not the real ones. If the act can be upheld upon any views of necessity or public expediency which the legislature may have entertained, the law cannot be challenged in the courts."

And again (page 555):

"I will not say that a law may not be so palpably evasive of constitutional provisions that it would be the duty of the courts to pronounce the law void; not, however, because the legislature intended to evade, while they violated, its provisions, but because they had not succeeded in the evasive effort. We are not made judges of the motives of the legislature; and the court will not usurp the inquisitorial office of inquiring into the bona fides of that body in discharging its duties."

The latter language was cited with approval in Re New York El. R. Co., 70 N. Y. 327, at page 351, where Judge Earl said that "it is not to be presumed or inferred that the legislature intended to violate or evade the constitutional restraints." The question there was whether the act under consideration was local or general. The claim was made that it was local, because there was but one elevated railway in actual operation in the state at the time of the passage of

the act. "How are we to know," said Judge Earl, "that there was but one in operation at the time of the passage of the act? Can a court take proof for the purpose of showing a statute valid and regular upon its face to be unconstitutional? * * * We do not know, and we cannot assume, that there was but one elevated railway in actual operation in this state at the time of the passage of the act." The learned judge quoted with approval from the opinion of Allen, J., in People v. Albertson, 55 N. Y. 50, that "no motive, purpose, or intent can be imputed to the legislature in the enactment of a law other than such as are apparent upon the face, and to be gathered from the terms, of the law itself." Summing up the result of this reasoning, the court concluded as follows:

"It may be that the construction which we have thus given to this act, and particularly to section thirty-six, may leave the way open to great abuse of legislative power, illustrations of which were given in the learned arguments before us. There may be ways for a legislature to circumvent a constitutional provision without violating it. History shows by many examples how the spirit of a constitution may be disregarded, and yet its letter observed. But there is a vital difference between the abuse of legislative power and its exercise in palpable violation of the constitution. For the former, the remedy is with the people alone, in the choice of faithful representatives who will respect their will; for the latter, alone, the courts, clothed with power always to be exercised with caution, can give a remedy."

From these authorities we may fairly deduce the just rule that, where legislation is upon its face susceptible of two inferences, one pointing to validity, and the other to possible evasion, the courts, giving the legislative body credit for good faith, are bound to draw the former conclusion. The conclusion of invalidity can be arrived at only when the legislative act in terms violates some constitutional provision, or when, upon its face, though not in express language, it is so palpably evasive of such constitutional provision that but one inference—that of intentional violation—can be drawn therefrom. The act under consideration does not come within this latter doctrine. Indeed, much of the argument against its constitutionality is simply criticism of the policy of the act, and an attempt to show that under it the contractor will secure an undue advantage over the city. Even if this criticism were valid, it would not establish a violation of the constitutional provision in question; but much of the criticism is unjust. Wide discretion is vested in a board of the highest standing and character under circumstances necessitating the grant of liberal powers to some public agency. It is not a fair inference that the limitations placed upon the board's contracting power are any index of the terms which will actually be made. The whole matter is within the discretion of the board, subject only to the limitations imposed upon it by the legislature. It will be the duty of the board to secure fair terms from the contractor. It need not contract at all until it secures such fair terms. Whether it secures them or not, it is not authorized, either directly or indirectly, to lend the city's money or credit to or in aid of the contractor; and it cannot be justly asserted that any contract which it makes under the act must have such effect. It follows that the act is not in conflict with the constitutional provision in question.

The next question is whether the acts violate Const. art. 3, § 18, providing that the legislature "shall not pass a private or local bill * * * granting to any corporation, association or individual the right to lay down railroad tracks." Section 1 of the act provides that "in each city having over one million of inhabitants, according to the last preceding national or state census, there shall be a board of rapid transit railroad commissioners." The claim is that New York City is the only city to which this section could possibly apply, and that consequently the act is local. Whatever might be our views of this question were it now an original subject of debate, we are concluded by repeated adjudications of the court of last resort. We need only refer to the unbroken succession of authorities upon this point: In re New York El. R. Co., 70 N. Y. 327; In re Church, 92 N. Y. 1; People v. Squire, 107 N. Y. 593, 14 N. E. 820; Ferguson v. Ross, 126 N. Y. 459, 27 N. E. 954. These cases distinctly hold that the act is general where it relates to particular persons or things as a class, and that it matters not that these persons or things are limited or restricted. So long as the terms of the law itself are not thus narrowed, its general characteristic is not thereby affected. It may be that a distinction should be drawn between cases where the local characteristic can only be ascertained by evidence dehors the act and those where that characteristic is apparent from facts of which the courts take judicial cognizance. However, we find nothing in the authorities to warrant this distinction. They proceed upon the broad principle which we have stated. Whether this distinction should be taken in the present instance we cannot therefore say without seeming to question these authorities. That duty must properly be left to the court from which the broad and general rule has emanated.

It is contended, too, that the rule laid down in these authorities has been changed by the classification of cities provided for in section 2 of article 12 of the new constitution. We think this classification has no relation to "general," "private," and "local" laws, as these terms are used in other provisions of the constitution. This classification was simply for the purpose of regulating the passage of special city laws, and of giving the local authorities a proper opportunity of asserting themselves with regard thereto. The division in this section of laws relating to cities into general city laws and special city laws was certainly not intended to affect the well-established meaning of general, private, and local laws under existing adjudications.

But, even if the act were held to be local, we should have to go further, and see whether it grants to any such corporation as the constitution refers to in this connection the right to lay down railroad tracks. We do not think that this provision of the constitution was intended to cover municipal or other governmental corporations. The corporations contemplated by the section under consideration were those referred to in the third section of the eighth article of the constitution,—corporations which were there construed to include all associations and joint-stock companies having any of the powers or privileges of corporations not possessed

by individuals or partnerships; in other words, corporations organized by individuals, in one sense, it may be, for the benefit of the public, but directly for the benefit of their promoters and stockholders. These corporations are the same as those referred to in section 10 of article 8 of the constitution. This section, as we have seen, prohibits any city—that is, any municipal corporation—from lending its money or credit to any corporation. The distinction between cities and ordinary corporations is thus clearly drawn. The intention plainly was to prohibit the legislature from passing any private or local act granting to any such ordinary corporation, whether private or quasi public, the right to lay down railroad tracks. There was no such intention with regard to counties, cities, towns, or villages, so far as these governmental agencies might operate within legitimate local purposes for the benefit of the inhabitants.

The next question is whether the act conflicts with section 6 of article 1 of the constitution, which provides that private property shall not be taken for public use without just compensation. This question is incidental, and it is, at least, doubtful whether it goes to the root of the general authority conferred by the act. It may, however, be briefly considered. Section 40 directs the rapid transit board to prepare maps or plans of the lands and property necessary to be acquired, or to which there may be appurtenant rights, terms, easements, franchises, or privileges necessary to be acquired, for the construction of the road; specifying upon the maps or upon accompanying memoranda the exact estate or interest requisite. One set of the maps and memoranda is directed to be filed with the department of public works, or other chief executive department having charge of the streets, and one with the register or county clerk. Provision is then made for the appointment of commissioners of appraisal, and they are required to take their oath, and file it in the office of the clerk of the county. Upon the filing of this oath, it is provided (section 47) that the city shall at once become seised of all the lands, estates, and interests described in the maps and memoranda, and have the right to enter into possession of the same, but that it shall become forthwith liable to the owners of the same "for the true and respective values thereof, together with interest from the time of filing the said oath," etc. It is, however, provided, that "no action shall be brought to recover the amount of such value or interest unless, within eighteen months after the filing of such oath, a report shall not have been duly made by commissioners of appraisal as herein provided, or such report shall not have been confirmed by the supreme court as herein provided, so that the city shall be liable to forthwith pay the amount by such report ascertained to be due for such value or interest." Sections 48 to 52 prescribe for the taking of testimony by the commissioners, and the confirmation of their report by the special term of the supreme court. Section 53 makes it obligatory upon the city to pay any award within four calendar months from the time of the confirmation of the report, with interest from the date of the filing of the oath. In default of such payment, the owners are permitted

to bring an action to recover the amount, "in which it shall be sufficient to declare generally for so much money due to the plaintiff or plaintiffs therein by virtue of this act for property taken or extinguished for the purpose herein mentioned, and the report, of said commissioners, with proof of the right and title of the plaintiff or plaintiffs to the sum or sums demanded shall be conclusive evidence in such suit or action." These provisions constitute a certain, definite, and adequate source and manner of payment. They are substantially like those which were found to be sufficient in Re Mayor, etc., of New York, supra. It is well settled that it is not necessary that the act shall provide for payment in advance of the taking, so long as the provision for compensation is certain and adequate. Sweet v. Rechel, 159 U. S. 380, 16 Sup. Ct. 43; Cherokee Nation v. Southern Kan. Ry. Co., 135 U. S. 659, 10 Sup. Ct. 965; Rider v. Stryker, 63 N. Y. 137; In re U. S., 96 N. Y. 237. Undoubtedly, the provision should also guaranty prompt payment; that is, payment without any unreasonable or unnecesary delay. We think that, considering the nature of the present undertaking, and the amount of property likely to be taken, this condition was fairly fulfilled by the provisions of the act.

The remaining points may be briefly disposed of. The office of rapid transit commissioner was not in existence at the time when the constitution which is said to have been violated by the manner in which the present rapid transit commissioners were appointed went into effect. It has been repeatedly held that the provisions of this constitution with regard to the election or appointment of city, town, or village officers related solely to offices which were in existence at the time of its adoption. People v. Palmer, 52 N. Y. 83; People v. Draper, 15 N. Y. 532; People v. Pinckney, 32 N. Y. 377; Fire Dept. of New York v. Atlas S. S. Co., 106 N. Y. 566, 13 N. E. 329. As to officers whose offices might thereafter be created by law, the provision was that they should be elected by the people, or appointed as the legislature might direct. As to such new offices, it has been held that the legislative power is not in any wise restricted; that it embraced all offices of every description, both local and general; and that the legislature was authorized to confer the power of appointment even upon such bodies as the chamber of commerce, and upon such persons as the presidents of marine insurance companies. Sturgis v. Spofford, 45 N. Y. 446. In this case, Church, C. J., said:

"It is insisted that the power of appointment can only be conferred upon some body or officer representing or responsible to the people. The language of the constitution does not justify this position. The power is not restricted. * * * The omission of any direction as to the appointment of such officers is significant of the intention of the framers and the people to leave the unrestricted power in the legislature."

This unrestricted power carried with it as an incident the power to appoint directly as well as through some other agency,—a power which has been repeatedly exercised without question, notably in Re Commissioners of Central Park, 35 How. Prac. 255 (Laws 1857, c. 771), and in the Case of the Aqueduct Commissioners, where vast

interests were involved, and which in Astor v. Mayor, etc., 62 N. Y. 567, was even extended to cover certain acts the power to perform which was at the time of the adoption of the constitution vested in local officers elected by the people.

It is also claimed that the legislature had no authority to provide a referendum to the people of the city. It has, however, been abundantly settled that there is no constitutional objection to an enactment referring to a municipality or other civil division of the state the question whether it desires the passage of a statute particularly affecting it. Bank of Rome v. Village of Rome, 18 N. Y. 38; Starin v. Town of Genoa, 23 N. Y. 439; Bank v. Brown, 26 N. Y. 467; Clarke v. City of Rochester, 28 N. Y. 605.

Lastly, there is nothing in the act which can be said to allow the city or the commissioners to enter into a contract in violation of the provisions of section 10 of article 8 of the constitution, to the effect that "no county or city shall be allowed to become indebted for any purpose or in any manner to an amount which, including existing indebtedness, shall exceed ten per centum of the assessed valuation of the real estate of such county or city subject to taxation as it appeared by the assessment rolls of said county or city on the last assessment for state or county taxes prior to the incurring of such indebtedness." It is to be presumed that public officers will do their duty; and one of their first duties is to respect and obey the constitution. The act is not invalid, because under it the commissioners might possibly make a contract which would transgress the provision in question; in other words, make an illegal contract in disregard of their duty. The act itself contemplates nothing of the kind, nor does it appear as matter of fact that such a contract will necessarily follow the due execution of the act.

We have thus considered all the questions presented by the present record, and our conclusion is that the acts in question are not in conflict with any provision of the constitution. The judgment appealed from was therefore right, and should be affirmed, with costs.

VAN BRUNT, P. J., and WILLIAMS, J., concur.

INGRAHAM, J. (dissenting). The question presented on this appeal is whether the provisions of chapter 752 of the Laws of 1894, and chapter 519 of the Laws of 1895, whereby provision is made for the issue of bonds by the city of New York to pay for the construction of railroads in the city of New York, are in violation of the constitution. A majority of the court has determined that it is constitutional for the legislature to require the city of New York to incur an indebtedness which must be repaid by taxation, the proceeds to be used to construct a railway. I dissent from this proposition, and shall endeavor, as briefly as possible, to state the grounds upon which, in my opinion, this legislation violates the express prohibitions of the constitution provided to protect the owners or property subject to taxation from being taxed for the construction

of public works, except those which are related to the ordinary municipal purposes. In deciding this question, I have not lost sight of the importance of proper and convenient rapid transit, realizing fully the desirability of additional means of communication between the different parts of the city, and how necessary it is for the convenience of a large proportion of our citizens that additional facilities should be provided to enable them to pass from their homes to their places of business; but the question presented to us is not in the nature of a legislative and administrative question, judging the advantages or disadvantages of a plan proposed. Upon us devolves the duty of determining whether a new departure in the legislative history of the state is in violation of the fundamental laws of the state, which have limited the use to which money raised by taxation or obligations which are to be paid from taxation may be applied. That this legislation is an absolutely new departure in the political history of this state none will deny. While certain cities and towns were, under legislative authority, allowed, prior to 1874, to loan their money to corporations or others who have built railroads to provide transportation for passengers and freight from one town or city to another, this is the first time within my knowledge where, private enterprise and private capital having failed to construct a railroad ardently desired by a considerable portion of a community, the legislature has attempted to impose upon a municipal corporation the obligation to issue its bonds, the proceeds of which are to be paid to contractors to build such a railroad. For the first time, the state has authorized a municipal corporation to build a railroad with the public money; and, to accomplish that, it has appointed commissioners to make contracts to build the road, giving such commissioners power to lease the road in perpetuity to the contractors who are to build it, and providing that the amount that such commissioners shall determine is to be paid to such contractors as the cost of such road, and to be paid by a municipal corporation by the issue of its bonds, which bonds are to be paid by taxation. A short examination of just what is to be accomplished by this new scheme will be useful when we come to consider the provisions of the constitution which it is claimed are violated.

The rapid transit act was originally passed in the year 1891. It was entitled "An act to provide for rapid transit railroads in cities of over one million inhabitants." As originally passed, it did not appoint a board of rapid transit commissioners, but provided that, in case a board had been appointed under the provisions of a previous act, it should be its duty to devise a means of rapid transit throughout the city for which it had been appointed, and, upon the completion of the plans for that purpose, to put up at public auction a franchise to build a rapid transit railway, and to superintend the building, and to some extent the operation of it, after the franchise had been disposed of. The act further provided for the organization of a corporation to take the franchise, and build and operate the railway, and contained further provisions limiting and regulating the operation of the road, not necessary to be further considered here. Under that act, the board of rapid transit com-

missioners was organized in the city of New York, which was and is the only city within the description of the act. The board proceeded to devise plans for a rapid transit railway through the city, and the franchise was put up at auction, as provided by the act; but it was found impossible to find any purchaser to bid for the franchise, or to undertake the construction of the road. When it was ascertained that the road could not be built by private enterprise, the legislature, in the year 1894, made many important amendments to the act, which was still further amended in 1895. Section 1 of the act was amended so that, instead of allowing for the appointment of the board of rapid transit commissioners by the mayor of the city to which the act applied, the legislature itself named a board, not a separate board for each city, but five commissioners were named, who, together with the mayor of the city, the comptroller, or other chief financial officer of such city, and the president of the chamber of commerce of the city of New York, were to constitute the board of rapid transit railway commissioners in and for each city in the state having over 1,000,000 inhabitants. Six of the eight commissioners were designated by the legislature without any relation to the particular city in which they were to act; and in each city having the required number of inhabitants these six commissioners were to constitute, with the mayor and chief financial officer of the particular city over which their jurisdiction extended, this board of rapid transit commissioners. These officers were not to be local city or municipal officers, and the commission was not a local or municipal commission, but a commission appointed by the state, having no relation to the particular city over the territory of which its jurisdiction extended, receiving no power or authority from the municipality, but acting directly under the general power of the legislature of the state. Vacancies were filled by a majority vote of the remaining members of the state board, and the board thus constituted was by the act "to have and exercise the specific authority and power hereinafter conferred, and also such other and necessary powers as may be requisite to the efficiency of the duties imposed upon said board by this act." Where this board purported to act on behalf of the city, it did so, not by virtue of any authority vested in it by the municipal corporation, but by virtue of the power conferred upon it by the lawmaking power of the state, over which the municipality or its regularly constituted officers had no control. It was essentially a state board, composed of state officers, and given large and undefined powers before vested in the legislature of the state. These powers were essentially legislative, locating railroads and granting franchises for operating them, with all the power requisite to the proficient performance of the duties imposed upon them, and were to be exercised, not by officers of municipal corporations, not by officers created to do one specific piece of work which was to vest in the municipal corporation when completed, and which was to be then in their possession and under their absolute control, but by officers appointed to act as rapid transit commissioners in all the cities of the state coming within the purview of the act. The

amendments also provided, among other things, that the question whether the rapid transit railway devised by the commissioners should be built by the city should be submitted to its people at a general election, and, if the vote was in favor of the city undertaking the enterprise, the act proceeds to regulate the manner in which the railway should be constructed, and how it should be operated and controlled. In general terms, the provisions of the act are that, after the plans and specifications had been prepared, and the necessary consents obtained, in the manner provided by the statute, the board of rapid transit commissioners shall contract with some person, individual or corporation, to build the road for a compensation to be paid by the city, and in the manner prescribed by the commissioners. The board were at liberty to make a contract with such person as in their judgment should be best qualified to carry it out, for such price and on such terms and conditions as they shall think to be best for the public interest. The statute further prescribed that the contract for construction should also provide that the corporation constructing the road should, at its own cost and expense, equip, maintain, and operate it for a term of not less than 35 nor more than 50 years, upon such terms as to rates of fare to be charged and the character of the service to be furnished as the board shall deem best suited to the public interest. The statute further required the board to provide in the contract that the city should secure and assure to the contractor the right to construct and operate the road, free of all right, claim, or other interference, whether by injunction, suit for damage, or otherwise, on the part of any owner, abutting owner, or other person. It provided for the rent to be fixed at not less than a minimum sum specified in the statute, and provided for a renewal of the lease upon such terms and conditions as to the board might seem just. Further provisions were contained in the statute with regard to a default of the corporation in paying the rental, or performing the conditions of its contract, which it is not necessary here to particularly specify. The act further provided for the raising of the necessary money by the city, and required the city to issue the necessary bonds for that purpose. The effect of the act was to give to the corporation which constructed the railroad, and agreed to operate it, full power and authority to take exclusive possession of it under its lease, and to run and operate it as a railroad during the term of its lease, and practically required the city to covenant with the corporation that it should have quiet and peaceable possession of the road during the term of the lease.

The intent of this act is apparent. Under its provisions, a board of rapid transit railroad commissioners, appointed by the legislature, are authorized to construct in each city of the state containing more than 1,000,000 inhabitants a railroad, upon a majority of the electors of such city voting in favor of such construction, and with the consent of certain local authorities. That vote and the consent of the local authorities having been once given, the nature of the railroad, its extent, its cost, the terms of the contract under which it shall be constructed, and the particular contractors who

shall be employed, are to be determined by the said board, over whom the municipal authorities have no control.   As part of the contract for construction, the board must make a lease of the railway, when completed, to the contractor, for a period of at least 35 years.   As to the terms of that lease and the rent to be paid, the city has no control; and, during the continuance of that lease, by no possibility can the city ever acquire the possession, use, occupation, or any power or authority over the road.   In case the contractors, shall fail to pay the rent or fulfill the conditions of the contract, it is the board of rapid transit commissioners who take possession of the road, and either operate it themselves or lease it to others to operate, with no power in the city to regulate the conditions or terms or rent to be received.   In such case the power of the board of rapid transit is unlimited.   As in case of such failure on behalf of the contractors, the rapid transit commissioners may either operate the road, or lease it to others, for such price as they may fix in their discretion.   And, by the express terms of the statute, this contract may provide for renewal or renewals of such lease, so that the lease may be a substantial perpetuity, with no right of the city to obtain any control over or possession of the property, or any right of any kind over it except to receive the rent that the rapid transit commissioners may deem best to impose upon the contractors.   No officer of the city, nor the municipal corporation itself, under such a lease, would ever acquire the possession or control of the property; nor would the city have the right to have any voice in fixing the rate of fare to be charged.   That, also, is to be provided for in the contract, at such an amount as the rapid transit commissioners shall fix.   After that contract is made, neither the city nor the state could alter the rates of fare which these rapid transit commissioners shall fix as the fare to be charged by such contractors.   All that the city can do and what the city is bound to do is to pay the sum fixed by the rapid transit commissioners as the price to be paid to its contractor that they may select, regardless of the amount of his bid, and all such further sums as shall be necessary to acquire such property as the rapid transit commissioners shall certify to be necessary for the proper construction, operation, or maintenance of the road, and such further sums as will be sufficient to pay all damages sustained by any one in consequence of such construction, operation, and maintenance of the road.   The statute itself, while contemplating the payment of many millions of dollars by the city, provides no safeguards for the prevention of claims by the contractors or others for payments outside of the contract; but, in the broadest way, imposes upon the city liability for damages that the construction or operation will entail, with no provision for the repayment of such damages by any one, leaving the city thus absolutely at the mercy of the contractors or others who sustain damages by reason of the construction or operation of the railroad.   And even this is not all, for, by the provisions of the statute, the rapid transit commissioners, with the consent of the contractor and his surety, may modify the contract in any respect, and thus, without the consent of the city,

impose additional burdens upon it. It is only necessary to read the remarks of Peckham, J., in delivering the opinion of the court in O'Brien v. City of New York, 139 N. Y. 588, 35 N. E. 323, to appreciate the possible effect of this omission upon the city of New York.

But no matter what the defects of this act may be, no matter what liability it may inflict upon the city of New York, no matter how grievous the burden the city will have to bear if it is enforced, if this act is not in conflict with an express provision of the constitution, this court has no power to interfere with it or to declare it void. I fully recognize the rule that the courts do not sit in review of the discretion of the legislature, or determine upon the expediency, wisdom, or propriety of legislative action in matters within the power of the legislature. Every intendment is in favor of the validity of statutes, and no motive, purpose, or intent can be imputed to the legislature in the enactment of a law other than such as are apparent upon the face, and to be gathered from the terms of the law itself. But "a written constitution must be interpreted and effect given to it as the paramount law of the land, equally obligatory upon the legislature as upon other departments of government and individual citizens, according to its spirit and the intent of its framers, as indicated by its terms. An act violating the true intent and meaning of the instrument, although not within the letter, is as much within the purview and effect of a prohibition as if within the strict letter; and an act in evasion of the terms of the constitution, as properly interpreted and understood, and frustrating in its general and clearly expressed or necessarily implied purpose, is as clearly void as if in express terms forbidden." People v. Albertson, 55 N. Y. 54.

We have thus to determine whether this act, providing that the money and credit of the city of New York shall be applied to the construction of a railroad under these conditions, violates any of the provisions of the constitution which restrict the power of the legislature.

In the year 1874 there was adopted by the people of this state a provision of the constitution which has continued in force from that time down, and which was readopted in the year 1894. This provision was made section 11 of article 8 of the constitution in 1874. It is therein provided:

"No county, city, town or village shall hereafter give any money or property, or loan its money or credit, to or in aid of any individual, association or corporation, or become, directly or indirectly, the owner of stock in or bonds of any association or corporation, nor shall any such county, city, town or village be allowed to incur any indebtedness except for county, city, town or village purposes."

To appreciate the force of this prohibition, it should, I think, be taken as a whole, and not considered as if it related to separate subjects. What was it that this provision intended to prevent? An acquaintance with the judicial history of the state will show that prior to this time many towns and cities had issued bonds to

aid in the construction of railroads under legislative authority, and it had been discovered that towns and cities had thus incurred large obligations, which were extremely onerous, and which returned to such towns and cities but small benefits in comparison with the burdens. So far as is known, it had not then been suggested that any city would engage in the building and owning of railroads itself; but railroad corporations had been able to obtain from cities and towns, in exchange for stock or bonds of the railway companies, city and town bonds, the proceeds of which had been applied to the purposes of the railway corporations. It was this condition that confronted the framers of this constitutional provision, and it seems to me that its obvious intent was to prevent the cities and towns of the state from investing their money in such enterprises. The provisions are broad. "No county, city, town or village" could give or loan its money or credit to aid an individual or corporation. Neither could it become directly or indirectly the owner of stock in or bonds of any association or corporation. "Nor shall any such county, city, town or village be allowed to incur any indebtedness except for county, city, town or village purposes." Const. art. 8, § 11. Thus, the city was prevented from giving or loaning its money to any individual, association, or corporation prevented from becoming interested in any way in the stock or bonds of such association or corporation, and, further, from incurring any indebtedness for any purpose other than a city, county, town, or village purpose. The general nature of this prohibition is exceedingly plain. It can mean but one thing, viz. that the money of a municipal corporation, raised by taxation, shall never be diverted from its purely municipal use. The money that the municipal corporation is allowed to collect by taxation is to be used for governmental purposes, including within that term the acquisition of such property as is necessary and convenient for the performance of the proper governmental functions. And within those functions are included the preservation of the public peace; the preservation of the public health; the opening of necessary streets, and building bridges; the maintenance of docks upon land owned by the city, or acquired for that purpose, as necessary for the public commerce of a seaport; the maintenance, lighting, and repairs of roads and highways. All of these are proper city purposes, and have been recognized as such for centuries by the common law of England and this state. But we are here asked to extend a city purpose from that of building a highway or street for the use of the whole people to the building of a railway to be given to a particular individual, to be operated by him for his profit, and over which the city can have no control, and the use of which it cannot regulate in any way. The term "city," in connection with "county, town and village," evidently applies to the municipal corporation as an entirety, incorporated by the state, and charged with certain governmental functions. Its existence is recognized as a means adopted for local governmental purposes. Its money is not to be loaned or given, and the city shall not be allowed to incur any indebtedness, except for city purposes.

Can it be a city purpose to acquire property which is to be used by an individual or corporation for profit, over which neither the city nor its citizens can have control, the use of which they cannot regulate, and where they can have no authority to impose the terms upon which it is to be used by others? Can it be a city purpose to invest $55,000,000 in property which, by a very possible contingency, may be operated or leased so that no return at all shall be paid to the city for its use, the city or its citizens powerless to obtain possession of or in any way control or use it, and from which, by means of a contract uncontrolled by the municipal corporation, the person in possession can exclude every one of the citizens of the city except upon payment of a fee, the amount of which neither the city nor its citizens can control? We are here dealing with a city purpose, a purpose for which the municipal corporation was organized, and not with a "public use," as that term is applied. This railroad, when finished, would be clearly a public use, as are all other railroads, waterways, and turnpikes of the state. And while the legislature could clearly authorize, as it has authorized in the past, and as this act, as originally passed, intended to authorize in the future, a corporation created for such purpose to construct, operate, and maintain a railroad in the city of New York, and as such railway, when constructed under such authority, would be a public use, and would be authorized as such to acquire the property of private citizens by the right of eminent domain, it is perfectly clear that such a railroad, so constructed, maintained, and operated by a private individual for a private gain, would not be for a city use or purpose. Is it not equally clear that any attempt by the legislature to grant to such a corporation so organized the money or credit of a municipal corporation would be clearly within the prohibition of this provision of the constitution that we are considering? Would the fact that the act authorizing such a contribution provided that the corporation should pay to the city of New York either such sum as it should fix, or as the city itself should fix, for the use of the money that it advanced to such association or corporation, prevent it being clearly within the prohibition of this provision of the constitution? What more than that does this act do? It appoints the commissioners, who are to build the road, who are to fix the amount that the city is to receive for the use of the road when built, and requires the city to issue to the individual named as the contractor its money or credit, to enable him to build the road, under a contract by which, while the bare legal fee remains in the city, the perpetual use and occupation of the premises are to remain with the contractor. Does it avoid the prohibition to say that the legal title vests in the city of New York, when the beneficial use and profits of the property are vested in another perpetually? Under this contract, who is to get the benefit if this road becomes a profitable undertaking, where large profits will be made by the operation of the road? Not the city. It never can receive more than the rent reserved to it by the contract between the rapid transit commissioners and the contractors. Who is to bear the burden if the undertaking prove a failure?

Clearly, the city, except so far as it is protected by the giving of a bond, the amount of which is entirely within the discretion of the rapid transit commissioners. And all through this act it is clear that the legislature was not thinking of the welfare of the city, was not thinking of this as a city purpose or city use, but as a public use. The commissioners are again and again directed by the statute that they are to determine questions submitted to them as the public interests require, and not the interests of the city of New York, or its citizens or taxpayers, whose money is to be used to construct this railroad.

In two cases there has been presented to the court of appeals the question as to the construction to be given to this phrase "city purpose," in the constitution; and it seems to me that, if we are to apply the principles there adopted in determining just what is a city purpose, then building a railroad under these conditions is within the condemnation of this provision of the constitution. The first case is People v. Kelly, 76 N. Y. 480. The court had to determine in that case whether or not building a bridge between New York and Brooklyn was a city purpose for the city of New York. The act under consideration in that case allowed the city of New York to obtain the stock of the corporation which had been organized to build a bridge between New York and Brooklyn, either by voluntary purchase or by condemnation proceedings. Upon obtaining that stock, the bridge company was to be dissolved; and, upon the dissolution of the bridge company, the bridge and all its appurtenances should vest absolutely in and belong to the two cities of New York and Brooklyn. The two cities were then authorized to finish the bridge, each city contributing a certain proportion of the cost. It was held in that case that it could not be said that the indebtedness authorized to be incurred by the cities for the construction of the bridge was not for a city purpose. The court, in laying down the principles which were to govern in determining what was and is a city purpose, said:

"It is impossible to define in a general way with entire accuracy what a city purpose is, within the meaning of the constitution. Each case must largely depend upon its own facts, and the meaning of these words must be evolved by a process of exclusion and inclusion in judicial construction. It would not be a city purpose for the city of New York to build a railroad from that city to Philadelphia, or to improve the navigation of the Hudson river generally between that city and Albany, although incidental benefits might flow to the city. Such works have never been regarded as within the legitimate scope of municipal government. On the contrary, it would be a city purpose to purchase a supply of water outside of the city, and convey it into the city, and for such a purpose a city debt could be created. So, lands for a park for the health and comfort of the inhabitants of a city could be purchased outside of the city limits, and yet conveniently near thereto. Such improvements are for the common and general benefit of all the citizens, and have always been regarded as within the scope of municipal government; and so, too, highways or streets leading into a city or village may be improved, provided the improvements be confined within such limits that they may be regarded as for the common benefit and enjoyment of all the citizens. It cannot therefore well be held, as claimed by the learned counsel for the appellants, that what is meant by a city purpose is some work or expenditure within the city limits. There could be no good reason for such a limitation. It could be no worse for a city to incur debt

for a city purpose outside of the city limits than for one within such limits, and there is just as much reason for allowing it to be incurred in the one case as in the other. The cities of New York and Brooklyn are intimately connected in many ways, by business, social, and commercial ties. Thousands who do business in the one city do business in the other. \* \* \* To bridge such a water separating two such cities must be a city purpose of each city. The bridge will be for the common benefit of all the citizens of both cities, and each citizen will have the same right to use it as every other citizen. It would have been a city purpose if either city had been authorized to build the whole of the bridge, and it is no less so that both are to unite in building it."

Applying this process of exclusion and inclusion, we find it would not be a city purpose to build a railroad from New York to Philadelphia, and as clearly not a city purpose to build a railroad from New York to Poughkeepsie. It would be a city purpose to improve highways or streets leading into a city provided the improvements be confined within such limits that they may be regarded as for the common benefit and enjoyment of all the citizens. It not being a city purpose to construct a railroad to another city, not because it would not be entirely within the limits of the city attempting to construct it, but because such a work has never been regarded as within the legitimate scope of municipal government, what, then, can be said to bring the construction of a railroad wholly located within a city, or extending from one end of the city to the other, within such scope? Not the fact that it is wholly within the city limits, because that is not the test. The test is that such improvements as are for the common and general benefit of all the citizens, and are within the scope of municipal government, are city purposes. Others are not. A railroad is constructed to the city limits from another city. The city is asked to continue the road from the city limits to the middle of the city, and, after such construction, to turn it over to the corporation or individual who has constructed the road to the city limits for its own use. Is it not clear, applying the test above stated, that the construction of such a continuance of the road would be no more a city purpose than the construction of the road beyond the city limits? Such a road would be for the use of the citizens, as would the railroad to be built under this act, viz. those of the citizens who could or would pay for the facilities furnished. Evidently, it might be of much benefit to the city, but it would not be a city purpose, because it would not be for the common and general benefit of all the citizens, and not within the legitimate scope of municipal government.

The question was again presented to the court of appeals in Re Mayor, etc., of New York, 99 N. Y. 584, 2 N. E. 642, when the question was as to the power of the city of New York to acquire lands just outside of its border for a public park. In that case it was stated to have been conceded that the acquisition and maintenance of public parks, securing pure air and healthful rest and recreation to the people, is a city purpose when executed within the corporate limits, but it was claimed in that case that it ceased to be a city purpose when to any degree or to any extent it moved outside

of those boundaries. The case of People v. Kelly, supra, was followed; and it was held that the test was not as to the location of the property sought to be acquired, but it was "argued that if a city may go three miles from its nearest boundary, and, with the connecting ribbon of a parkway, take Pelham Bay and Hunter's Island, why may it not take the Falls of Niagara, or a mountain of the Adirondacks, or land in Dutchess county, and, building a road thither, claim it to be for a city purpose?" And as to that argument the court say:

"The inquiry as to a park at Niagara or in the Adirondacks remains unanswered. Beyond question, neither would be a city purpose; and, when we have determined why, we should have approached as near to what is the true test as the nature of the subject will permit. While, as was said in one of the cases cited, it is impossible to formulate a perfect definition of what is meant by a city purpose, yet two characteristics it must have. The purpose must be primarily the benefit, use, or convenience of the city, not a portion of the citizens, as distinguished from that of the public outside of it, although they may be incidentally benefited, and the work be of such a character as to show plainly the predominance of that purpose. And then the thing to be done must be within the ordinary range of municipal action."

We have here again the test. The improvement must be primarily for the use or convenience of the city, as distinguished from that of the public generally, and then the thing to be done must be within the "ordinary range of municipal action." Is the building of this railway a thing which is within the ordinary range of municipal action? Never before has a municipality attempted such an undertaking within our knowledge. And then, again, the avowed purpose of this act, to which attention has been before called, is that this property is not to be acquired by the city as an absolute owner, so that it would be entitled to the possession, control, or use of the property as for a city purpose for the common benefit of all its citizens, but it is to be turned over to the contractors, who are to use it, control it, and manage it, subject to no city control, and under such conditions that the city may never receive any consideration for its use for their own benefit and profit. In both of these cases cited, the property, when acquired, was to vest absolutely in the city, and be subject to its control, and to be for the free and uncontrolled benefit and use of all the citizens of the city.

The case of Hequembourg v. City of Dunkirk, 49 Hun, 550, 2 N. Y. Supp. 447, is also relied upon by the learned counsel for the respondents. That was a case where the construction of an electric light plant by the city to furnish light for its own streets, and also for its inhabitants, was upheld; but the learned judge, in writing the opinion, expressly placed it upon the ground that the lighting of the streets and public places is one of the duties devolving upon the municipal government, and is a city purpose, within the provisions of the constitution; that the lighting of streets and public places is placed upon the same principle that has upheld the municipal action in obtaining pure and wholesome water for the use of the city. It was there expressly held that furnishing light for private dwellings is a use more of a private nature, and not a duty of the municipality.

The case of Walker v. City of Cincinnati, 21 Ohio St. 14, and the several cases which follow it, are not in point. The constitution of the state of Ohio forbade any city to become a stockholder in any corporation, or to raise money for or loan its credit to or in aid of any corporation. The legislature had empowered any city of the first class to build a railroad from that city to any other terminus in the state, or in any other state. The supreme court of Ohio held that the act was not within the constitutional prohibition above quoted, which was clearly correct. It went on further to hold that such an enterprise was a city purpose, which is contrary to the opinion of the court of appeals in the cases above cited. But it held nothing which at all applies to the case at bar.

Again, we must clearly call to mind the distinction between a public use and a city purpose; and this distinction is emphasized when we consider the difference in the language used prohibiting the state from giving or loaning its money or credit and that used in relation to cities. Article 8, § 10, of the constitution, was adopted at the same time as the provision now in question, and it was there provided: "Neither the credit nor the money of the state shall be given or loaned to or in aid of any association, corporation or private undertaking." This provision might not preclude the state from building a railroad, which would be clearly a public use; but, when the prohibition relates to the subdivisions into which the state is divided for the purpose of local government, the language used is different, and the prohibition is much broader. That prohibition is. not that the credit of a city shall not be used for a private undertaking, but that it shall not be used for any purpose except a city purpose. But the construction and operation of a railroad is not the only business that has been recognized by the law as being of public interest, or as having more or less of a public character. Thus, the establishment of an elevator for the purpose of loading vessels with grain has been so considered (People v. Budd, 117 N. Y. 1, 22 N. E. 670, 682); also, the operation and maintenance of a theater (see People v. King, 110 N. Y. 418, 18 N. E. 245). And the power of the legislature to control the keepers of hotels or inns has been frequently applied, on the ground that this use of their property was "affected with a public interest"; and if the public character of the business, or use to which the property is put, controls, I can see no reason why the city of New York should not be compelled to erect hotels to be used for the accommodation of guests, theaters to be used for the amusement of its citizens, elevators to be used by the railroads for loading grain from their cars, stage or cab lines for the carrying of passengers, or for almost any use or purpose which is required for the convenience or amusement of the people. It is solely a question of power, and it seems to me that it is just such a use of public money and public credit that this constitutional prohibition was intended to prevent.

I have laid stress upon the fact that these rapid transit commissioners were appointed by the legislature, and were state officers, whose duties were not confined to the city of New York alone, but extended over the whole state, applicable to each city of the state

containing over 1,000,000 inhabitants. It is not intended to intimate a doubt as to the power of the legislature to create or appoint its officers who shall act for the city; but, in determining whether or not a use to which the city's money is to be applied is a city purpose, it is certainly important to determine whether or not property which is to be acquired with such money is to become the substantial property of the city in such a sense that the city retains over it the usual control that one has of property that he owns; and when such officers are appointed to acquire property on behalf of the city for which the city has to pay, but where all the beneficial use, management, and control of such property are continued indefinitely under the control of such state officers or persons with whom they make contracts, and when the clear and avowed object of the act is to compel the city to pay for the property which it can never use and never control, but which is to be used for the profits of a private individual or corporation, and which the citizens of the municipality can use only in connection with all the other citizens of the state or county or the public generally, upon paying such compensation as shall be fixed by agreement between such state officers and the individual or corporation who is to have the use of the property, it seems to me that the essential elements of a city use or purpose are absent, and that the acquisition of such property is not a city purpose. "The legislature, when legislating in view of this constitutional limitation, must determine, in the first instance, what is a municipal purpose. Its decision is not, however, final. When its act is challenged, as in conflict with this constitutional limitation, the courts must determine whether debt is authorized to be incurred for a purpose not municipal." People v. Kelly, supra.

But this provision of the constitution under consideration also expressly prohibits municipal corporations from loaning their money or credit to or in aid of any individual, association, or corporation, and does not this scheme directly violate this constitutional prohibition? If the legislature had provided that this board of rapid transit railway commissioners should make a contract with a named railroad company to build a railway in the city of New York at the contract price as fixed between the commissioners and the railroad company to be paid by the city of New York, and upon the completion of the road the railroad company was to have the exclusive use of the road upon paying to the city a sum of money, would not that be a direct loan of its money or credit by the city of New York in aid of the railroad company? And yet in what essential particular does this act differ from that suggested, except that instead of the legislature designating the corporation or individual who was to receive the money to build the road, and, after the road was built, to receive the right to occupy, maintain, and operate it, the determination of the individual was left to the officers appointed for that purpose? It certainly is not essential that the legislature itself should name the individuals, association, or corporation to whom the money or credit of the city is to be given or loaned. It left the determination of that question to the officers

whom it has appointed; and when these rapid transit commissioners select the individual who is to make the contract, and make the contract with such individual or corporation to build the road, the city is then bound to issue its bonds for the purpose of enabling that contractor to carry out his contract to build a road, the operation and control of which he is to have for his own profit.

Even before the adoption of this constitutional amendment of 1874, the power to make such a disposition of public money would have been a matter of serious doubt. In the case of People v. Flagg, 46 N. Y. 401, the act provided that the town bonds should be issued for the improvement authorized by the act to be made, and the objection there taken was that the legislature had no power to compel the town to incur a debt for such an improvement; but the court held that as to the question of power there was no restriction in the constitution, and that, when power is conceded, the court had no right to inquire into the motives or reasons for doing the particular act. The court then continued:

"The legislation in question is open to serious criticism. It compels a large, if not extravagant, expenditure of money, and imposes onerous burdens upon the whole people without their consent. If the object of the expenditure was private, or if the money to be raised was directed to be paid to a private corporation, who were authorized to use the improvements for private gain, the question, in my judgment, would be quite different; and in this respect there is a limit, beyond which legislative power·cannot legitimately be exercised."

Is not the money to be raised here directed to be paid to a private corporation or individual, viz. the contractors who were authorized to use the railroad for private gain? And when we have, in addition to the restrictions contained in the constitution as it existed when this view was expressed, the further restrictions adopted by this amendment of 1874, much further limiting the uses to which city money or credit can be applied, is it not apparent that the whole spirit and intent of this limitation upon the power of the legislature to dispose of money raised by taxation is violated, as well as the express terms of the constitution?

I can come to no other conclusion, having given to the determination of this question the utmost care and thought,·than that this whole scheme of a building, by the city, of a railway to be used by private individuals or corporations for their own benefit, is not a city purpose, and was beyond the power of the legislature to authorize. I am therefore constrained to the opinion that this judgment should be reversed.

RUMSEY, J. I concur with Judge INGRAHAM in the conclusion which he has reached, and in the reasons which he has given; but, in view of the importance of the case, I think it is not improper to state, as shortly as may be, some reasons additional to those advanced by him why, in my judgment, the rapid transit act is unconstitutional so far as it authorizes or requires the city to expend its money for the construction of a railroad.

In examining the question, I shall not be unmindful of the rules

which must govern courts in deciding upon the constitutionality of an act of the legislature. They are laid down by Judge Allen in the case of People v. Albertson, 55 N. Y. 50, and are so fully stated by Judge INGRAHAM in his opinion that they need not be recapitulated here.

The section of the constitution, so far as it is material to the consideration of this case, provides that no county, city, town, or village shall hereafter give any money or property, or loan its money or credit, to or in aid of any individual, association, or corporation. * * * Nor shall any such county, city, town, or village be allowed to incur any indebtedness, except for county, city, town, or village purposes. The question, as presented by this record, upon this branch of the case, is whether the building of a railroad within the limits of any city of the state by the government of that city is a city purpose, so that it may be permitted to be done within the prohibition of this section of the constitution. In examining this act, it must not be forgotten that this is not a special city act, passed solely to affect the city of New York, but that it is a general law. Such is its necessary construction, within the rules laid down by the court of appeals (In re Church, 92 N. Y. 1; People v. Squire, 107 N. Y. 593, 14 N. E. 820); and such is the construction given to it by the majority of the court. That this construction is correct, and that the act is intended to be a general act, necessarily appears from the manner of its amendment in 1895. At that time the constitution provided that no special city law should become operative until it had been approved by the mayor of the city to which it applied, or by the mayors of the several cities to which it applied, if such cities were not all in one of the classes arranged by the constitution. Const. art. 12, § 2. As this act applied to only a part of the cities of the first class, and not to all the cities of any class specified in the constitution, therefore, if it was a special city act, and not a general law, the act of 1895, amending it, could not become operative until it had been accepted by the mayors of each of the cities to which it applied. The act was amended in 1895 in very important matters. In regard to these matters it is claimed by the board of rapid transit commissioners, and it is conceded on all hands, that the amendments were valid and operative, which could not be the case if it was a special law, unless the amendments had been accepted by the mayor of the city of New York. This was not done in that year. We are justified, therefore, in saying, as is said by the majority of the court, that this act is a general act, and that it is applicable not only to the city of New York, but to every other city in the state just as soon as that city shall come within its description. It is quite true that no other city is now within the description of those mentioned in the title to the act, but it is equally true that by the next census at least one other city will be within its description, and it is more than probable that, before a second census shall take place, a third city will be competent to come under its provisions. The act, therefore, cannot be construed as though it were applicable simply to the city of New York, but it must be examined in view of its appli-

cability to any city which may at any time become subject to its provisions.

As we have seen, the act substantially gives to the city the power, at the will of its inhabitants, to incur an indebtedness for the building of a railway which, when built, shall not be operated by the officials of the city for the benefit of the city, but shall be operated by a corporation for its own profit, upon payment of a rent, which corporation shall have the entire and exclusive control of it, free from the right of interference on the part of the city, or of any of its officials, just as long as the rent shall be paid. While this is the necessary effect of the act, yet it is proper to say that no stress will be laid, in this opinion, upon the fact that the road, when built, shall be operated by a corporation which shall have exclusive control of it; but the discussion will proceed entirely upon the theory that that of itself is immaterial, and the question argued will be whether it is a city purpose for a city to construct a railroad within its own limits, no matter whether that railroad is to be operated by the city officials or by some corporation for its own profit and advantage.

As might be expected, there is neither in this state nor anywhere else any decision or authority on that subject. The case of People v. Kelly, 76 N. Y. 475, has been cited as an authority upon the question presented; but a careful consideration of that case shows that no such question was or could have been presented to the court. In that case, by the laws of 1867 and 1869, a corporation was organized to build the Brooklyn Bridge, and the cities of New York and Brooklyn were authorized to become the owners of the stock of that corporation. In 1874, the bridge having been partly completed, and the corporation being unable to finish it, the legislature empowered the cities of New York and Brooklyn to become the owners of all the stock, and to complete the bridge, and abolished the corporation which had existed before then. This act prescribed a limit of the cost of the bridge. After the two cities had assumed the construction of the bridge, an application was made by the board of bridge trustees for a mandamus to compel the comptroller of the city of New York to pay over to the trustees, pursuant to the statute, to apply upon the expenses of construction, a certain amount of money, which was within the amount to be paid by that city. This was resisted by the comptroller, upon the ground that it appeared that the bridge could not be completed within the limit of the amount of money which the act had authorized to be expended for that purpose. The question presented to the court was, in the first place, whether the limit of cost of the bridge as prescribed in the act was a restraint upon the powers of the board of bridge trustees, so that they would not be permitted to go on with the construction of the bridge when it became apparent that it could not be completed for the sum allowed. After the passage of the act of 1874, the constitutional provision which has been quoted above had taken effect, and the further question was presented to the court, under that provision, whether the building of this bridge was a city purpose. That question was, as stated

by Judge Finch in another opinion, ably argued and frankly decided. The building of the bridge was held to be a city purpose, and the ruling was put upon the ground that it "had always been the policy of the state for two towns, separated by a stream of water, to bridge the stream at joint expense, and the construction of such a bridge was a town purpose of each town." The underlying principle of the decision is that the building of bridges, like the building of highways, is a public purpose, which, within the limits of municipal corporations, has always been devolved upon those corporations, and that they may be required, not only to build highways within their own limits, but may be required to construct such bridges to adjoining towns upon their limits as may be necessary to afford access to their own territory to the great body of the people of the state who have occasion to come there. It was conceded in the opinion that the building of bridges, like the building of highways, was a public purpose, within the power to construct highways; that they are portions of the highways, and their construction is governed by the same rules as the construction of highways; and the kernel of the opinion lies in the sentence which was just quoted. It is quite true that one statute of 1869, which authorized the construction of this bridge by a corporation, gave to the corporation the power to construct a railroad track from one end of the bridge to the other; but there was nothing in the case of People v. Kelly which shows that the attention of the court was brought in any way to this provision of the statute, or that it appeared that it was the intention of the two cities to construct any such railroad, or to do anything more than they were authorized to do by the law of 1874, which was to buy the stock of the company, and build the bridge. It cannot be said, in the absence of any reference to that provision of the statute, that the court intended to hold, or did hold, that the building of a railroad upon this bridge, which was no necessary part of the construction of the bridge, was within the power of the cities, because they had no occasion to pass upon that question.

No other case is cited which either precisely or by fair inference is conclusive upon the case at bar, and we are therefore compelled to examine the question practically as a new one. While this is so, yet we are not without expressions of judicial opinion by the highest court of this state as to what must be considered in examining the question whether any given use is a city purpose. In the case just cited, it is said by Judge Earl that "each case largely depends upon its own facts; and the meaning of these words [a city purpose] must be evolved by a process of exclusion and inclusion in judicial construction." He says that it would not be a city purpose for the city of New York to build a railroad from that city to Philadelphia, or to improve the navigation of the Hudson river generally between that city and Albany, although incidental benefits might flow to that city. Such works have never been regarded as within the legitimate scope of municipal government. On the contrary, he says it would be a city purpose to purchase a supply of water outside of the city, and convey it into the city, and for

such a purpose a city debt could be created. So, he says, lands for a park, for the health and comfort of the inhabitants of the city, could be purchased outside of the city limits, and yet conveniently near thereto. Such improvements, he says, are for the common and general benefit of all citizens, and have always been regarded as within the scope of municipal government. He says, too, highways or streets leading into a city or village may be improved, provided the improvements be confined within such limits that they may be regarded as for the common benefit and enjoyment of all the citizens. People v. Kelly, 76 N. Y. 487, 488. While Judge Earl, in that opinion, declines to lay down any rule as to what may be a city purpose, or give any definition of the phrase, yet it is evident that he regards it as essential that the object to be attained shall be for the common benefit and enjoyment of all the citizens, and that no purpose is a city purpose unless it complies with that requirement.

The same question came again before the court of appeals in Re Mayor, etc., of New York, 99 N. Y. 569, 2 N. E. 642. That was an application of the mayor of the city for an order to appoint commissioners to appraise lands to be taken for a public park for the city of New York, in the county of Westchester, outside the limits of the city. The application was opposed upon the ground that the taking of the land for a park outside of the limits of the city was not a city purpose, and therefore the city had no right to incur the indebtedness. The case was decided substantially upon the authority of People v. Kelly, above cited; but Judge Finch, in delivering the opinion of the court, took occasion to examine somewhat into the meaning of the phrase "a city purpose," although he, too, declined to attempt to define it. It was conceded in that case that the taking of lands for a park inside the city was a city purpose, and the question discussed was whether it ceased to be a city purpose when the lands sought to be taken extended in any degree outside of these boundaries. In deciding the question, Judge Finch says:

"While it is impossible to formulate a perfect definition of what is meant by 'a city purpose,' yet two characteristics it must have: The purpose must be primarily for the benefit, use, or convenience of the city, as distinguished from that of the public outside of it, although they may be incidentally benefited, and the work be of such a character as to show plainly a predominance of that purpose; and then the thing to be done must be within the ordinary range of municipal action." 99 N. Y. 590, 2 N. E. 651.

This opinion of Judge Finch was concurred in by all the judges who took part in the decision. It has been followed more than once since, and it must be regarded as an authoritative statement by the court of appeals of two essential elements which are required to constitute a city purpose in order that indebtedness may be contracted by the city for it.

When the court say that the thing done must be within the ordinary range of municipal action, it is meant, I suppose, that it must be a thing intended to attain the objects for which cities are primarily organized. It is not intended to say by that phrase that a city can do nothing which it or some other city has not done

before, but simply to lay stress upon the idea that no city is at liberty to incur an indebtedness for any work except such as is germane to the purposes for which city governments are established. These are solely the purposes of local administration. It is said by Judge Dillon that municipal corporations are institutions designed for the local government of towns and cities; or, more accurately, towns and cities, with their inhabitants, are, for purposes of subordinate local administration, invested with a corporate character. Dill. Mun. Corp. § 12. This local administration must provide for the protection of the people in their persons and property, the care and preservation of their health, and the establishment and maintenance of good order. These things are the ordinary purposes for which a city government is organized on its own behalf. People v. Common Council of Detroit, 28 Mich. 228. In addition to that, it has imposed upon it certain other duties, which are more especially governmental in their nature, but which its officials are required by statute to undertake as the agents of the legislature, and as a part of the machinery of the state government. The chief of these duties are the making and improvement of the public highways and bridges, and the regulation and control of docks and ferries (Bedlow v. Dry-Dock Co., 112 N. Y. 274, 19 N. E. 800), and the imposition and collection of taxes (People v. Flagg, 46 N. Y. 401). I apprehend that no purpose can be said to be a legitimate city purpose unless it falls within one of these classes. So far as I can discover, there is no case in the books, nor any discussion by a text writer, in which the acts which a city may properly perform as within a city purpose are not attributed to one of the objects stated above.

If the power to build a railroad is to be regarded as a city purpose, it can only be so if it can be ranged within one of the classes above mentioned. This act is a general act, and, if the purpose therein expressed is a city purpose for the city of New York, it is equally a city purpose of any other city, within its purview or within the state. The legislature were not called upon to limit the operation of this act to cities of a million of inhabitants, any more than they were called upon to limit the operation of the street-railway act to those cities; but, if the building of a railway is a city purpose for one city, it must be equally a city purpose for any city within the boundaries of the state. Indeed, if it can be said to be a city purpose to transport by artificial means the people of one city from one place to another for their business convenience or pleasure, I am utterly unable to conceive why it is not equally a town purpose to build railroads from one extremity of the town to the other, that those living at one end of a large town may more conveniently market their products or do their business at the customary place than they would with the present means of communication. But the argument of convenience proves too much. If the municipal corporation can be authorized to do whatever may merely enhance the convenience of any large portion of its people, under the pretense that it is a city purpose, it is difficult to see where the right of incurring indebtedness will stop. It would be

convenient to establish cab lines from one river to the other in the city of New York, but no one would dream that an indebtedness to do that could be authorized upon the ground that it was a city purpose. The same line of argument which lays down as a criterion the convenience of a number of people must have as much force in one case as another, provided there are citizens living within the limits of the municipal corporation whose convenience will be promoted by the establishment of additional means of artificial transportation. There is no just limit in principle where the line can be drawn. The legislature has limited this act to such cities as shall from time to time have a million inhabitants within their boundaries, but that was a mere matter of expediency. If the legislature had the power to authorize it to be done by one city, it has equally the power to authorize it to be done by any other city. It cannot be said, in any just sense, that this power to build a railroad is to be exercised either for the health of the inhabitants, or the protection of their persons or property, or for the maintenance of good order. In no way can it affect these things in the slightest degree. Indeed, it is not claimed that the power to build this road grows out of any of these duties. If it can be sustained at all, it must be upon the ground that the railroad thus built is a public highway, and therefore it is within the power of a city to establish and operate it.

The duty of establishing highways is undoubtedly devolved upon the different municipal corporations of this state by the legislature, and is a public purpose; and it may fairly be said, I think, that the establishment of a highway within the limits of a city, although primarily a duty of the state government, is yet a city purpose. But every public purpose to be exercised within the limits of a city is not necessarily a city purpose. The building of a capitol in the city of Albany, for the use of the officials of the state, was a public purpose, for which lands might be taken, in the exercise of the right of eminent domain; and yet no one would claim that that was a city purpose, and that the people of the city of Albany could be compelled to pay their money to do it. So the building of fortifications for the protection of the city of New York or the city of Buffalo is no doubt a public purpose of grave importance to the people of those cities, respectively, and yet no one would claim that the building of such works within the limits of those cities was a city purpose, for which the city could be made to pay. Cooley, Const. Lim. 219. These two examples are illustrations of the necessity of confining the definition of a city purpose to something which is within the ordinary range of municipal action. Undoubtedly, it is within the ordinary range of municipal action to build a highway; and if this railroad can be said to be a highway, within the ordinary definition of "highways," and adaptable to the same purposes for which highways are usually used, it may fairly be said to be a city purpose; but unless it is either a highway in the same sense as an ordinary street, or unless it is within the purpose for which highways are ordinarily constructed by a city, it clearly is not a city purpose.

It is quite true that, in a certain sense, a railroad is a public purpose, for which the right of eminent domain may be exercised, and the franchise of which is a public franchise; but yet it is clear that it cannot be said to be a highway, in the sense in which ordinary highways and streets are said to be such. An ordinary highway gives to the public a right of passage, with the powers and privileges incident to that right, but it gives that right to each one absolutely and completely. It is essential to the notion of a highway that its use must be common to all citizens. 3 Kent, Comm. 432. No one can be excluded from that use. It is constructed under the power of the state for that purpose. The object of its building is that every citizen may go backward and forward upon it at his pleasure, on foot or with such means of transportation as he has at hand.

As is said by Judge Peckham in the case of Eels v. Telegraph Co., 143 N. Y. 133, 38 N. E. 202:

"The primary or fundamental idea of a highway is that it is a place for uninterrupted passage by man, animals, or vehicles, and a place by which to afford light, air, and access to the property of abutting owners, who, in this respect, enjoy a greater interest in the street than the general public, even though their title to the land stops with the exterior line of the street. It is not a place which can be permanently and exclusively appropriated to the use of any person or corporation, no matter what the business or object of the latter might be." 143 N. Y. 140, 38 N. E. 204.

At an early day in the history of this state, it was claimed that a railroad was only a different kind of highway, and using the highway for that purpose was only a different mode of exercising the right which had been acquired by the people. But, as was said by the court of appeals, the argument met with no favor from the court. The proposition was promptly and clearly denied; so clearly that since that time no well-considered case has ever attempted to renew it. Trustees of Presbyterian Soc. v. Auburn & R. R. Co., 3 Hill, 567; Williams v. Railroad Co., 16 N. Y. 97, 104–109. If there is anything clearly settled in this state, it is that there is a vast difference, not only in circumstances, but in principle, between the use of land for an ordinary street and that for a railroad. Indeed, the circumstances under which highways are constructed show that such must be the essential right attached to them. It is necessary for the existence of civilized society that all men should have means by which they may communicate with their neighbors, and perform their public and private duties as citizens. This necessarily requires them to go from their homes to the places where such things are to be done. To enable them to do that, it is absolutely essential that some way should be established over which every one of them may have the right to go. This, in the nature of things, can be done only by the government, which has the right to acquire land necessary to give the right of way from one place to another. I apprehend that upon this necessity lies the foundation of the power of the state to build and maintain highways and bridges and ferries. But, when those means of communication are established, the duty of the state has been done. If business convenience requires a more rapid means of transportation

than each man has at hand, for the convenience of a part, but not all, of the community, it is for the state to furnish it; but that must more properly be left to private enterprise, which shall supply such rapid means of communication as business necessities require. That has been devolved in this country upon private corporations; and while such corporations, organized for such ends, have been held to be carrying out to a certain extent a public purpose, it has been recognized that the use of highways for those purposes was not the ordinary use of a highway, but something additional, which imposed a different burden upon the land, which applied the land taken to other than ordinary highway purposes, and which would not be permitted to such an extent as would obstruct the passage of the street, or take away the right of the public to use it. Trustees of Presbyterian Soc. v. Auburn & R. R. Co., supra; Fobes v. Railroad Co., 121 N. Y. 505, 24 N. E. 919; People v. Kerr, 27 N. Y. 188; Drake v. Railroad Co., 7 Barb. 508. In each of these cases the rule was recognized that the construction of a railroad upon a street imposed a different burden upon the land than that put upon it by dedication for ordinary street purposes. Of this, there can be no doubt. The difference is plain, and need not be enlarged upon. It is idle to say that a strip of land upon which there is no roadway, to which the public have no access except at certain places, where they have no right to go except in carriages furnished for them, upon which, if they go, they are trespassers, and which is to be leased to a private corporation, which shall have the sole and exclusive use of it, is a highway, and serves any of the purposes of a highway. It is nothing of the sort, and its construction cannot, I think, be attributed to the power given to municipal corporations to build "highways," in the ordinary sense of that word.

If I am right in this conclusion,—and I see no escape from it,— the power of a city to build a railroad within its limits cannot be called a "city purpose," within the authority which it has to lay out and construct highways. I can find no other object among those for which municipal corporations are organized to which this power can be attributed. The cases above cited hold that it is within the power of the state to impose upon a highway the additional burden of a railroad; but they do not hold that the state can build it; and, if the state has that power, it does not follow that a city has it, because there is no constitutional prohibition in that regard upon the legislature. Unless the power to build this railroad can be said to be a city purpose under the duty which has been imposed upon a city to lay out and construct highways, I am utterly unable to see from what other one of the purposes for which municipal governments are organized it can be derived. This power must stand, if at all, upon the broad proposition that it is within the proper scope of the duties of a municipal corporation to do within the limits of the city whatever may add to the convenience of any large portions of the citizens in the transaction of their business, or which will to any considerable extent increase the value of any portion of their property. Indeed, as I understand

the opinion of the majority of the court, this is said to be a city purpose solely upon the ground that it tends to the convenience and comfort of a large portion of the inhabitants in the transaction of their business, and it becomes important because at present private persons cannot be induced to undertake it. But the fact that the thing which ordinarily should be intrusted to private enterprise, and which has heretofore always been so intrusted, may to some extent partake of a public character, because it promotes the convenience or prosperity of a municipal corporation, has not been supposed to invest that enterprise with such a public nature as to authorize municipal corporations to undertake it. Weismer v. Village of Douglas, 64 N. Y. 91; Hay v. Cohoes Co., 3 Barb. 47; Memphis Freight Co. v. Mayor, etc., of Memphis, 4 Cold. 419; Gardner v. Trustees of Village of Newburgh, 2 Johns. Ch. 166; In re Niagara Falls & W. Ry. Co., 108 N. Y. 375, 15 N. E. 429. These authorities are a complete answer, as it seems to me, to the proposition upon which the constitutionality of this act is made to stand. As is said by Judge Dillon:

"To clothe these corporations with powers to accomplish purposes which can better be left to private enterprise is unwise. Their chief function should be to regulate and govern. To invest them with powers of individuals or private corporations for objects not pertaining to municipal rule is to pervert the institution from its legitimate ends, and to require of it duties which it is not adapted satisfactorily to execute." Dill. Mun. Corp. § 12.

The constitution says that no city shall contract an indebtedness for the purpose of performing such duties. That provision of the constitution was adopted at a time when municipal corporations throughout the state were incurring large indebtedness by investments in the stock and bonds of private corporations organized for precisely the same purposes as are sought to be attained here. It was intended by that amendment that the debts of cities should be confined to purposes which were purely municipal.

It is quite true that for over 200 years the city of New York has owned and controlled the docks along the water front, and the ferries extending to the places on the opposite side of the rivers which bound it, and that it has leased these ferries and docks to private individuals; but it must be recollected that, long before the constitutional prohibition now in question was adopted, this property was the private property of the city of New York, and that provision of the constitution was not intended in any way to affect the management by the city of its private property. But, even were that not so, the erection and control of docks and the management of ferries has always been a public purpose, which it is within the power of the legislature to devolve upon any municipal corporation precisely as it has devolved upon them the duty of building highways. It is conceded that this act is a departure from and an advance beyond all previous legislation, in that it gives to the cities mentioned in it powers which they have not heretofore exercised. It seems to me, as I have endeavored to show, that this power is not only outside the ordinary range in which municipal corporations have thus far acted, but it extends their powers fur-

ther than can be justified by any fair construction of our constitution, and certainly further than ever has been done before. This whole legislation is fraught, as I believe, with danger to the commonwealth, because the necessary effect of it cannot be otherwise than to draw within the power of the legislature, and to impose upon the state and city authorities, the management and control of every agency which can in any way tend to the convenience of the people, or which can be supposed in any way to advance their prosperity. As is said by Judge Andrews in Re Niagara Falls & W. Ry. Co., 108 N. Y. 385, 15 N. E. 432, "it would be impracticable and contrary to our usage for the state to enter upon the general business of constructing and operating railroads." It is just as much impracticable and contrary to our usages for the state to devolve this duty upon the municipal corporations which are organized for entirely different purposes. This particular scheme commends itself to great numbers of people because of its apparent necessity, but none the less it is a step beyond the ordinary duties of a municipal corporation, which opens up the way to the most serious evils to the community.

For these reasons, and within the rules which have been laid down by the courts, and the necessary inferences to be made from them, I believe that the purpose to be accomplished by this act is entirely outside of the ordinary range of municipal purposes, and cannot be said to be a city purpose, and no city can be permitted to contract an indebtedness to do it. For these reasons, in addition to those stated by Judge INGRAHAM, I am compelled to dissent from the majority of the court.